IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JAMES S. PULLIAM,

      Plaintiff,

vs.                              Case No. 16-2161-JTM

WICHITA STATE UNIVERSITY,

      Defendant.

MEMORANDUM AND ORDER

James Pulliam was the Chief Information Officer for Wichita State University. Prior to his termination, he worked with WSU's Chief Data Officer David Wright during the fall of 2014 in interviewing employees for the positions of Chief Information Security Officer (CISO) and Project Management Officer (PMO). Pulliam alleges in his Complaint that Wright made various offensive comments reflecting race and gender bias, and that when he attempted to complaint about these comments to individual University Vice-President Tony Vizzini and to President John Bardo, WSU terminated his employment. WSU has moved to dismiss the Complaint, which presents a claim of unlawful retaliation under Title VII of the Civil Rights Act.

In its motion to dismiss, the university makes two arguments. First, it contends that

Pulliam could not have had a reasonable and good faith belief that he acted in opposition to race or gender harassment, both because the alleged harassment was not serious and pervasive, and because Pulliam made no timely attempt to oppose the harassment. Rather, as far as WSU's employment of Pulliam, "the train had already left the station" before his complaint was ever made. (Dkt. 10, at 2). Thus, according to the defendant, Pulliam could not have had "a reasonable good-faith belief that the opposed behavior was discriminatory." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

Second, the university argues that Complaint fails to demonstrate that Pulliam was terminated because of any opposition to harassment, but rather indicates that he "waited to report the conduct until his job was in jeopardy." (*Id*. at 12). The defendant acknowledges that its causation argument "is much the same" as its first argument, in that both rely on inferences as to the subjective motivation for Pulliam's comments.

The court finds that the Complaint should not be dismissed. The Complaint does not clearly establish that, in WSU's continued metaphor, the "wheels were in motion" in terms of terminating Pulliam's employment, and that plaintiff "waited until he knew his job was on the line to report the conduct he claims was inappropriate." (Dkt. 10, at 2, 11). Rather, the Complaint indicates that on November 26, 2014, Vizzini called Pulliam into his office and said that "his management style was 'not working out.'" (Dkt. 1, ¶ 34). Pulliam asked for examples, but Vizzini could not give any.  A short time later, on December 5, 2014, Wright gave Pulliam a letter of recommendation which insinuated Pulliam would be terminated. According to the Complaint, Wright is a co-worker of Pulliam, with no

2

supervisory authority over him.

Rather than indicating that Pulliam had already essentially been fired—and actual termination was a mere formality—the cited portions of the Complaint might be taken by a rational fact-finder as evidence of retaliatory intent, in that Vizzini and Wright were responding to Pulliam's complaints to Wright that his comments were offensive. And, far from indicating that the Complaint effectively "admit[s]" that he was about to be "fired due to poor job performance," (Dkt. 10, at 1), the Complaint contains no admission that Pulliam's termination was merited by substandard performance.

To the contrary, as noted above, the Complaint alleges that, when challenged, Vizzini was unable to explain how Pulliam's management style was unsatisfactory. Further, the Complaint indicates that the Vizzini made his criticism of Pulliam's management style only after Wright responded to Pulliam's opposition to his comments by conveying "false information ... regarding Plaintiff and his job performance" to Vizzini and Bardo. (Dkt. 1, ¶ 33).

The EEOC filing attached to the Complaint repeats the allegations that Vizzini's comments were both unjustified and substantially less than an indication that the train had left the station. With respect to the former, Pulliam indicates in the EEOC charge that Vizzini told him "we need to turn this thing around." And Pulliam again indicates that any concerns about management style were unjustified. He was, he writes, "Totally surprised, especially since I had never met with him prior to this meeting," and that when "I asked him for specifics or examples ... I was told that he would have to get back to me on that."

3

(Dkt. 1, Exh. 1).

Accepting plaintiff's allegations as true, the Complaint does not show that the plaintiff acted without good faith in complaining about Wright's alleged comments in emails to WSU's Directors of EEO and Affirmative Action and of Human Resource on December 9, and the following day to Vizzini and Bardo.

The same result holds true for the underlying comments, one allegedly related to race and nine which allegedly reflect gender bias, which WSU argues could not be reasonably taken to be discriminatory in nature. (Dkt. 10, at 6-9). First, the cases cited by WSU all involve determinations rendered following summary judgment. *See, e.g., Semsroth v. City of Wichita*, 304 Fed. Appx. 707, 725 (10th Cir. 2008) (upholding award of summary judgment); *Shinwari v. Raytheon Aircraft*, 16 F.Supp.2d 1308, 13223 (D. Kan. 1993) (a lack of good faith was "the only permissible inference which reasonably flows *from this record* ").

Second, what matters is not whether the specific comments would be separately actionable, but whether Pulliam might have had a mistaken but good faith belief that discrimination had occurred. *See Shinwari,* 16 F.Supp.2d at 1320) (citing *Love v. Re/Max of America, Inc.*, 738 F.2d 383, 385 (10th Cir.1984)).

According to the Complaint, Wright on six occasions referred to the female Chief Information Security Officer as a "bitch." He also told Pulliam, "you couldn't have hired anyone uglier." With respect to another female manager, Wright said, "at least you found someone better looking." In addition, Wright made one sexually explicit comment in the

4

workplace in front of an unspecified number of WSU employees and nonemployees.

WSU attempts to contextualize these comments, noting that the term "bitch" was used in reference to a single individual, and that in *Semsroth* the Tenth Circuit indicated that term is particularly revelatory of gender bias when used as to many women. 304 Fed.Appx. at 725.

Again, however, *Semsroth* involved a resolution upon summary judgment, and the court indicated that the term might "itself be a form of differential treatment" in some cases. But the court did not indicate that a use of the term as to a single female was devoid of evidentiary value. To the contrary, the court wrote:

> "[W]e have characterized th[at] word as a 'sexual epithet[ ]' that courts have described as 'intensely degrading' " to women. [*EEOC v.*] *PVNF*, 487 F.3d [790,] 799 [(10 Cir. 2007)] (quoting *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir.1996)); *see also Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1144 (11th Cir.2008). When a supervisor "tolerate[s] the use of the word 'bitch' to describe" a plaintiff, "a *jury* should decide whether these comments were made because of gender animus." *PVNF,* 487 F.3d at 799 (emphasis added); *see also Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999) ([G]ender-based insults, including the term 'bitch,' may give rise to an inference of discrimination based on sex.").

*Id.* (footnote omitted). Of course, the term here was not directed *at* Pulliam, but it was repeatedly uttered in his presence, and the court cannot find that his decision to complain of the comments was necessarily an unreasonable action or devoid of good faith, particularly when considered in the context of the other gender-charged comments set forth in the Complaint.

The University may be on more solid ground with respect to the single instance of

5

an alleged racially offensive term. The Complaint alleges that, during their interviews for the CISO position, Wright told an African American candidate who was struggling to answer a question, "don't pimp us out." (Dkt. 1, ¶ 26; Dkt. 1-1, at 1). WSU argues the term is "facially neutral," while Pulliam stresses that the term "is associated with racial stereotypes." (Dkt. 10, at 9; Dkt. 11, at 10). The cases cited by the parties address the racial implications of phrases which include the term "pimp." *Cf. Hanson v. Perry Tech.*, 206 F.Supp.2d 1223, 1233 n. 18 (S.D. Fla. 2002) (use of the terms "pimps and ho's" in reference to mixed race crowd was not race-related), *with Perkins v. Nat'l Express Corp.*, 105 F.Supp.3d 970, 977-78 (N.D. Cal. 2015) ("pimpmobile" used in reference to a luxury car driven by African–American male "carries a discriminatory meaning").

Here, the Complaint alleges only a single instance of the term, but one which was used directly in reference to an African American job applicant. The defendant correctly notes that the term "pimp" has been used as a very ambiguous slang term. (Dkt. 12, at 4). However, even with "the advent of a range of benign figurative uses" for "pimp," the term "pimp out" remains generally viewed as pejorative. *See* J. Sheidlower, *A History Pimping: What the word meant and what it means now*, SLATE, Feb. 11, 2008.[1]

> The existence of benign, figurative senses of *pimp* may have done something to "soften" the word's image among some people. Indeed, it's not hard to find casual uses of *pimp* by mainstream journalists who hope to sound fresh and young. But *pimp out* ... has not had a similar progression. Though there are examples of *pimp out* from the 18th century, the expression was very rare before the 1980s, and its meaning has almost always been literal. There is no real figurative use for *pimp out*, which may help explain why [such] phrasing

---

[1] http://www.slate.com/articles/life/the_good_word/2008/02/a_history_of_pimping.html

sounds so objectionable.

*Id.*

Of course, the Complaint as written supplies no context for how, or even why the term was used. Whether a pejorative or not, the comment "don't pimp us out" appears to make no sense as a rejoinder to a job applicant struggling to formulate an answer to a question. Nevertheless, as the court noted with respect to the use of the term "pimpmobile" in *Perkins,* and the suggestion in that case that the term was race-neutral, "it is precisely this ambiguity that creates a genuine dispute of fact over whether the reference involved a discriminatory racial connotation." 105 F.Supp.3d at 977. And, even if the comment by itself would not present an actionable claim for racial discrimination by the applicant, as noted earlier the issue before the court is whether Pulliam might have had a good faith basis, even if mistaken, for objecting to the comment. The court finds that the Complaint does not preclude such a determination, but presents a plausible claim that Pulliam opposed discriminatory conduct, and that such opposition resulted in adverse employment treatment.

IT IS ACCORDINGLY ORDERED this 20th day of October, 2016, that the defendant's Motion to Dismiss (Dkt. 9) is hereby denied.

             ___s/ J. Thomas Marten_____
             J. THOMAS MARTEN, JUDGE